**Affirm and Opinion Filed June 30, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00091-CV**

**IN THE INTEREST OF B.C.C. AND K.M.C., CHILDREN**

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-08-09495-Z**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Carlyle
Opinion by Justice Osborne

The father of B.C.C. and K.M.C. ("Father") appeals the termination of his parental rights. In five issues, Father challenges the legal and factual sufficiency of the evidence to support the trial court's decree of termination and contends he was denied due process and a jury trial. We affirm the trial court's judgment.

### BACKGROUND

B.C.C.'s and K.M.C.'s mother ("Mother") died of cancer almost a decade ago. After Mother's death, B.C.C. and K.M.C. initially lived with Father and then with Mother's sister ("Aunt"). Aunt is now suffering from cancer and relinquished care of B.C.C. and K.M.C. to the Texas Department of Family and Protective Services ("Department") in 2019.

Father has had infrequent contact with the children throughout their lives. He testified at trial that when Mother died, the children lived with him for a time long enough for him to enroll them in school and to make an unsuccessful attempt to find counseling to help them in dealing with their mother's death. But he testified that at the end of the school year, Aunt took the children, ostensibly for the summer, but never returned them. He testified that he did not know where they were and did not have the means to find them. There is nothing in the record to indicate that he tried. During the children's time with Aunt, there were multiple reports of physical abuse in the home. The family worked through services with the Department, and the case was closed. Aunt apparently homeschooled the children, possibly without certification to do so.

Father had no contact at all with the children for many years until the Department located him and served the citation for this suit. Since then, Father has had three in-person visits with the children and subsequent infrequent contact by telephone. Before the pandemic, Father ceased attending in-person visits, and during the pandemic, has changed telephone numbers several times, making contact difficult. The Department appointed a "courtesy worker" for Father to assist in completing ordered services, but Father completed only one counseling session. His drug tests have been positive for cocaine. Father did, however, appear at trial, and he attended pretrial hearings.

At trial, the court heard testimony from Ladecra Cooper, the Department's conservatorship worker for K.M.C. and B.C.C., Fred Partlo, the children's advocate, and Nickieta Trejo, the courtesy worker the Department assigned to Father. Father also testified. The children's guardian ad litem, Michael Simmons, questioned witnesses and made a closing statement. We detail the substance of the testimony in our discussion of Father's issues.

> As to B.C.C., the trial court found:
>
> The Court finds that [Father] the father of [B.C.C.], the child the subject of this suit, pursuant to Sections 161.001(1)(O) of the Texas Family Code, has:
>
> Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.
>
> The Court also finds that termination of the parent-child relationship between [Father], and [B.C.C.], the child the subject of this suit, is in the best interest of the child.

The trial court made separate, but identical, findings as to K.M.C.

Based on these findings, the trial court rendered judgment terminating Father's parental rights to each child.[1] This appeal followed.

---

[1] Father has not paid any child support for either child, but the trial court found him to be indigent, and the trial court's judgment specifically provides that child support "is not addressed in this order and is hereby specifically reserved for further action."

## ISSUES

Father contends the trial court erred by terminating his parental rights because (1) the trial court proceeded with the suit before Father was properly served; (2) the court erred by proceeding with trial before the court because Father filed a jury demand; (3) the evidence is legally and factually insufficient to support the trial court's findings under family code section 161.001(b)(1)(O); (4) the evidence is legally and factually insufficient to support the trial court's findings that termination of his parental rights is in the children's best interest, and (5) the evidence is legally and factually insufficient to support the appointment of the Department as managing conservator.

## APPLICABLE LAW AND STANDARD OF REVIEW

"Involuntary termination of parental rights implicates fundamental constitutional rights." *In re S.P.,* 168 S.W.3d 197, 202 (Tex. App.—Dallas 2005, no pet.). But "[w]hile parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.,* 89 S.W.3d 17, 26 (Tex. 2002). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20–21 (Tex. 1985); *In re M.C.*, 352 S.W.3d 563, 565 (Tex. App.—Dallas 2011, no pet.).

In a termination proceeding brought under section 161.001 of the family code, the petitioner must establish one ground listed under section 161.001(b)(1) and must also prove that termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. TEX. FAM. CODE §§ 161.001(b), 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. "Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child." *In re M.C.*, 352 S.W.3d at 565 (internal quotation omitted).

In evaluating the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable fact finder could have done so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *In re M.C.*, 352 S.W.3d at 566.

In reviewing the evidence for factual sufficiency, we give due deference to the fact finder's findings and do not supplant the judgment with our own. *In re A.B.,* 437 S.W.3d 498, 503 (Tex. 2014). We determine whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(b)(1) and that the termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1); *In re M.C.*, 352 S.W.3d at 566. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re M.C.*, 352 S.W.3d at 566.

In addition to making the statutory predicate findings for termination under section 161.001(b)(1)(O), the trial court concluded that termination of Father's parental rights was in each child's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). Father also challenges the legal and factual sufficiency of the evidence to support this finding.

"Best interest" is a term of art encompassing a broad "facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 & n.22 (Tex. 2013). The best interest prong "is child-centered and focuses on the child's well-being, safety, and development," *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018), and it allows a court to consider the following non-exclusive factors:

(1)   the desires of the child;

(2)   the emotional and physical needs of the child now and in the future;

(3)   the emotional and physical danger to the child now and in the future;

(4)   the parental abilities of the individuals seeking custody;

(5)   the programs available to assist these individuals to promote the best interest of the child;

(6)   the plans for the child by these individuals or by the agency seeking custody;

(7)   the stability of the home or proposed placement;

(8)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re A.C.*, 560 S.W.3d at 631 & n.29 (citing *Holley*, while listing many of these same factors and noting that family code section 263.307 also provides additional best-interest factors).

These "*Holley* factors" are not exhaustive, and a best-interest finding need not be supported by evidence of every *Holley* factor. *In re C.H.*, 89 S.W.3d at 27. The same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied). Moreover, while there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment

is in the child's best interest. TEX. FAM. CODE §§ 153.131(b), 263.307(a); *In re D.W.*, 445 S.W.3d at 925.

**DISCUSSION**

**1. Service of process and notice of preliminary hearing**

In his first issue, Father contends the court "proceed[ed] with the suit" and granted the Department's requested relief at a preliminary hearing before he was served with process. He argues that the trial court entered temporary orders naming the Department as temporary managing conservator of the children on May 28, 2019, before service was made on him either by publication on June 13, 2019[2] or in person on June 7, 2019.[3] Father also complains that an attorney ad litem was appointed for him prematurely, before service by publication was accomplished. The gist of Father's complaint is that the trial court made findings of "continuing danger" to the physical health or safety of the children "if returned to the parent, conservator, custodian[,] or guardian presently entitled to possession,"[4] when he—"the parent entitled to legal possession in the underlying court order"—"ha[d] not even been located to ascertain if there is a danger." Father relies on family code provisions setting forth procedures the Department must follow in a suit to protect the health

---

[2] The record reflects that the citation was published in the *Daily Commercial Record* on May 24, 2019, and the corresponding return of service by publication was filed in the trial court on June 13 or 14, 2019.

[3] In his brief, Father argues that personal service was made on him "on or about June 7, 2019," but also contends that the trial court held a hearing on June 11, 2019 "[w]ith still no service executed" on him. The record reflects that Father had been served both by publication and in person before the June 11 hearing.

[4] Father quotes this language in his brief from an order that is not included in the appellate record.

and safety of a child and civil procedure rules governing service of process. *See* TEX. FAM. CODE §§ 262.102, 262.103, 262.105, and 262.109, and TEX. R. CIV. P. 106, 107, and 244.

The Department responds that family code section 262.201 permits the court to "render a temporary order without delay at any time after the filing of the action without regard to whether notice of the citation by publication has been published" when citation by publication is needed because the location of the parent is unknown. TEX. FAM. CODE § 262.201(o). The Department also responds that (1) Father has forfeited his complaint because he did not object to entry of the temporary order through his attorney ad litem or at any time after he was served and appeared, citing cases for the proposition that personal jurisdiction can be waived by failure to object in the trial court,[5] and (2) any error in entering the temporary order would not require reversal of the trial court's ultimate decree of termination in any event. The Department argues further that even if the trial court's entry of the May 28, 2019 temporary order was error, Father was subsequently served citation by personal service and personally appeared before the trial court. The Department contends that these events gave the trial court jurisdiction to render its judgment, and Father has not shown how any error in entering the temporary order caused the rendition of an

---

[5] The Department cites *Trenz v. Peter Paul Petroleum Co.*, 388 S.W.3d 796, 800 (Tex. App.—Houston 2012, no pet.), and *Ellis v. Ellis*, No. 05-19-00587-CV, 2020 WL 3496352, at *1 (Tex. App.—Dallas June 29, 2020, no pet.) (mem. op.), in support of its argument.

improper judgment, as required to show reversible error. *See* TEX. R. APP. P. 44.1 (no judgment may be reversed for an error of law unless the error probably caused rendition of an improper judgment or prevented the appellant from properly presenting the case to the court of appeals).

When the Department filed its petition regarding B.C.C. on April 16, 2019, the children had not lived with Father for many years, and the petition and affidavit in support of removal reflect Father's address as "unknown." Similarly, the Department's first amended petition and supporting affidavit that added K.M.C. as a subject of the suit on May 8, 2019, reflected Father's address as unknown.[6] The supporting affidavits reflect that Aunt relinquished possession of the children to the Department—by dropping them off at the Department's offices—necessitating immediate action for the children's protection.

Father concedes that "perhaps the court moved forward with appointing an attorney ad litem for parent cited by publication in order to proceed with the temporary orders hearing." But he argues that because service by publication had not been completed, "it was not the proper time to appoint an attorney," and the court lacked authority on May 28, 2019 "to remove the children from [Father] and proceed with [the Department's] pleadings to take legal conservatorship of the children."

---

[6] The Department's affidavit in support of removal reflects that K.M.C., aged 14 at the time, did not know Father's name when asked by the Department worker.

The record reflects that only when Father had been properly served, had appeared, and had been heard did the trial court render any ruling regarding permanent possession of the children. The temporary orders were just that—temporary—and absolutely necessary for immediate care of the children. The family code permits the court to make temporary orders under these circumstances. *See* TEX. FAM. CODE § 262.109(d) (notice may be waived on showing that parent could not be located or for other good cause); *id.* § 262.102 (findings necessary to issuance of temporary order authorizing government entity to take possession of child). We decide Father's first issue against him.

**2. Request for jury trial**

In his second issue, Father complains that the trial court erred by proceeding to trial without a jury. Father filed a jury demand on September 14, 2020. *See* TEX. FAM. CODE § 105.002(a) (party to suit under family code may demand jury trial in proceedings that do not include adoption or the adjudication of parentage); TEX. R. CIV. P. 216 (requirements for jury trial request). He did not, however, object when the case proceeded to trial without a jury or otherwise bring the matter to the trial court's attention.

A party is required to act affirmatively in order to preserve the right to complain on appeal that he was denied his perfected right to a trial by jury. *Vardilos v. Vardilos*, 219 S.W.3d 920, 923 (Tex. App.—Dallas 2007, no pet.). We explained in *Vardilos* that "although a party perfects its right to a jury trial in accordance with

rule of civil procedure 216, if the trial judge instead proceeds to trial without a jury, the party must, in order to preserve any error by the trial judge, 'either object on the record to the trial court's action or indicate affirmatively in the record it intends to stand on its perfected right to a jury trial.'" *Id.* (quoting *Sunwest Reliance Acquisitions Grp., Inc. v. Provident Nat'l Assurance Co.*, 875 S.W.2d 385, 387 (Tex. App.—Dallas 1993, no writ)). The right to a jury trial is not self-executing and may be "waived expressly or by a party's failure to act." *Sunwest Reliance*, 875 S.W.2d at 387–88.

As in *Vardilos*, the record does not show that Father either objected to the case going forward without a jury or indicated in any way to the trial court that he intended to stand on his perfected right to a jury trial. *See Vardilos*, 219 S.W.3d at 923. We conclude Father waived any right to complain on appeal of the trial court's alleged error. *See id.* We decide Father's second issue against him.

3. **Sufficiency of the evidence to support termination of Father's parental rights**

In his third issue, Father challenges the legal and factual sufficiency of the evidence to support termination of his parental rights under family code section 161.001(b)(1)(O). A trial court order under family code section 161.001(b)(1)(O) is "a mandate or directive that establishes some steps or actions necessary for the parent to obtain return of the child who is in the Department's custody." *Interest of N.G.*, 577 S.W.3d 230, 238 (Tex. 2019) (per curiam) (citing TEX. FAM. CODE

§ 161.001(b)(1)(O)). "[T]o terminate parental rights under section 161.001(b)(1)(O): (1) the parent must have failed to comply with the provisions of a court order, which (2) specifically established the actions necessary for the parent to receive custody of the child from the Department, which serves as the permanent or temporary conservator of the child." *Id.* at 237.

On July 2, 2019, the trial court ordered Appellant to participate in parenting classes, a psychological evaluation, individual and family counseling, random drug and alcohol urinalysis and hair strand tests, and to follow through with recommendations made by any service providers as arranged and paid for by the Department. The trial court's written order, made the same day as a hearing at which Father appeared, specified these requirements. *See Interest of N.G.*, 577 S.W.3d at 239 (court of appeals must consider specificity of order when upholding termination under section 161.001(b)(1)(O)).

Cooper, the Department witness, and Trejo, the courtesy worker, also testified that Father was required to undergo a psychological evaluation, a drug and alcohol assessment, individual and family counseling, random drug testing, and parenting classes. The only requirement Father fully completed was the psychological evaluation. He started individual counseling but was discharged by the counselor for lack of interest and failing to attend further sessions. When Father moved, the Department assigned Trejo to set up classes near Father's new home. Father did not attend them.

Cooper testified that there was "a breakdown of communication" with Father "throughout the case." Father participated in three visits with the children between July 2019 and the date of trial in October 2020. Cooper testified that the visits "went well." The last of those visits, however, occurred in October 2019. Cooper testified that after the last visit in October 2019, "the department was unable to get [Father] to commit to doing visits." She explained that despite the Department's efforts, including assigning the courtesy worker to communicate with Father, the Department "struggled with remaining in contact" with Father because his phone number changed so often. This was especially true during the pandemic when visits "have gone to virtual." Because of the difficulties in contacting Father, visits by telephone seldom occurred. Cooper testified that the children spoke to Father by telephone on Father's Day in June 2020, and on another occasion in September, 2020, but were unable to reach him in their other attempts.

Father argues: (1) the Department never removed the children from him; (2) there are no allegations that he neglected or abused the children and there is "zero evidence" that he ever did so; (3) although counseling was required, the order did not designate a required number of sessions or specific goals, and he did attend some sessions; and (4) family counseling was never set up for his participation.

In response to Father's first and second arguments, the Department argues that the children were "removed" from Father for purposes of section 161.001(b)(1)(O) when the trial court named the Department as temporary managing conservator.

Subsection (O) addresses conditions for "return of the child who has been in the permanent or temporary managing conservatorship of the Department." TEX. FAM. CODE § 161.001(b)(1)(O). B.C.C. and K.M.C. were in the Department's managing conservatorship once Aunt relinquished them to the Department and the trial court signed its first temporary orders. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *Interest of N.G.*, 577 S.W.3d at 238 (order under § 161.001(b)(1)(O) establishes actions necessary for parent "to obtain return of the child who is in the Department's custody").

This Court has questioned the applicability of subsection (O) when the parent challenging termination did not live in the household from which the children were removed and was not involved in the other parent's conduct that led to the removal. *Interest of A.T.*, No. 05-19-00346-CV, 2019 WL 4126603, at *8 (Tex. App.—Dallas Aug. 30, 2019, no pet.) (mem. op.) (evidence that child was living with Mother, not Father, at the time of removal "undermines application of subsection (O)" where only Mother's conduct led to removal); *Interest of M.K.*, No. 05-18-01297-CV, 2019 WL 2283886, at *4 (Tex. App.—Dallas May 29, 2019, no pet.) (mem. op.) (same).

Here, however, there was evidence that Father's neglect did contribute to the removal. The children initially lived with Father after Mother's death. Father enrolled them in school and cared for them. But for nine years following that period, Father took no action to ensure the children's welfare even though he believed that Aunt had "kidnapped" them. His testimony that the police refused to become

involved in a civil matter conflicts with his testimony that he did not contact the police because his family did not want Aunt to be arrested. And although he testified that he did not know where Aunt had taken the children, he also explained that he was aware Aunt had not enrolled them in school because he looked for them and could not find them "in the system." Father was the children's sole surviving parent. The children were in his care after their Mother died. While the children lived with Aunt, the Department responded to reports of physical abuse in Aunt's home. Witnesses testified to the children's emotional and behavioral issues and their struggles in school.

Father's nine years of neglect after taking initial responsibility for the children contrasts with the circumstances in *Interest of M.K.* and *Interest of A.T.*, where the children resided with their mothers at all times and the fathers did not contribute to the circumstances leading to the children's removal. *Cf. Interest of M.K.*, 2019 WL 2283886, at *4 (citing testimony that "Father was not responsible for the Department's involvement or for M.K.'s removal in this case"; Department's conservatorship resulted from "abuse and neglect by Mother"); *Interest of A.T.*, 2019 WL 4126603, at *8 ("A.T. was placed in the conservatorship of the Department as a result of abuse and neglect by Mother, *not Father*"). "Abuse and neglect" under subsection (O) can include the risk or threat of abuse or neglect. *See In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014) (per curiam); *Interest of E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). And here, in contrast to *Interest of M.K.* and *Interest of A.T.*, the

Department did not initiate the children's removal from Aunt's home; its involvement was necessitated by Aunt's conduct. We conclude that the record supports application of subsection (O).

Father's third and fourth arguments—that he attended some counseling sessions, and other sessions were not set up—do not explain his failure to complete the other requirements of his service plan or the positive results of his drug tests. "[S]ubstantial or partial compliance with a court-ordered family service plan is generally insufficient to avoid termination pursuant to subsection (O)." *Interest of D.G.*, No. 01-20-00720-CV, 2021 WL 1256895, at *6 (Tex. App.—Houston [1st Dist.] Apr. 6, 2021, no pet. h.) (mem. op.). Further, the record reflects that further counseling sessions were not scheduled because of Father's lack of interest, not because of logistical difficulties Father had in attending. *Cf. Interest of L.G.*, 596 S.W.3d 778, 780 (Tex. 2020) (per curiam) (where factors other than father's indigence prevented him from complying with his court-ordered service plan, such as anger at a counselor and failure to communicate with a case worker despite having a telephone, father did not present error warranting reversal as to termination of parental rights).

Father also contends that he was unable to comply with specific provisions of the trial court's order through no fault of his own, despite his good faith effort to do so. He relies on family code section 161.001(d), which provides that a court may not order termination under subsection (b)(1)(O) if the parent proves by a preponderance

of the evidence that he was unable to comply with specific provisions of the order, he made a good faith effort to comply, and the failure to comply was not attributable to any fault on his part. TEX. FAM. CODE § 161.001(d)(1), (2); *see also Interest of Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (per curiam) (court of appeals must address merits of section 161.001(d) as it relates to termination of parental rights under section 161.001(b)(1)(O)).

To support his argument under family code 161.001(d), Father argues he was "battling some serious physical health problems including walking pneumonia" and "may have had COVID." Because he was afraid to take public transportation in Dallas, he "walked two miles in the summer heat to take a drug test." His phone number often changed because of financial difficulties. He "is not allowed to work" due to a disability and lives on "$800 from the government." Arguing that his disability is not his fault, he contends his testimony supports the conclusion that "he tried his best and gave good faith efforts to complete his services."

But the record reflects that Father's illness did not occur until the summer before trial. He does not explain how his financial difficulties or his disability precluded his attendance and participation in visits with the children, at counseling, or at parenting classes, especially where the record reflects that the Department appointed a courtesy worker to assist him in visiting with the children and fulfilling the services closer to his home. Further, Cooper testified that Father was discharged from counseling "[d]ue to lack of interest and failure to schedule and communicate

with the therapist and schedule his sessions," not for financial reasons or problems arising from his disability. Nor does Father explain why he could not maintain contact with the Department or the courtesy worker to facilitate the visits with his children and the coordination of his services by informing them when his telephone number changed. He offered no explanation for his positive drug tests other than that he had not used cocaine in "a long time," and conceded that if the test showed his hair "was dirty, it was dirty." And when asked why he did not comply with his services during a six-month period before he got sick, he answered, "Remember, I told you earlier, and I told you, I got another child. I had another family," with a child who was sick.

Based on our review of the record, we conclude that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(O). We also conclude that Father did not establish by a preponderance of the evidence that he was unable to comply with the provisions of his service plan and that he made a good faith effort to comply but had been unable to comply due to no fault of his own. *See* TEX. FAM. CODE § 161.001(d). We decide Father's third issue against him.

4.    **Sufficiency of the evidence to support the trial court's best interest findings**

In his fourth issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in the best interest of the children. Citing *Holley*, Father contends the evidence does

not show it is in B.C.C. and K.M.C.'s best interest to terminate their relationship with him.

**A. Father's contentions**

Father argues:

- The Department has not provided the children with consistent, trauma-based therapy "even though they need it." In contrast, Father "did attempt to get the children therapeutic services when they were in his possession";

- Since they came into the Department's possession, the children have been moved into multiple placements (B.C.C., six, and K.M.C., four) because of behavioral issues, and already have had two incidents in less than a month at their current foster home;

- The likelihood of their being adopted is very low, and the current foster parent does not have an interest in adoption. If the possibility of adoption arises later, the Department could seek termination then when losing the relationship with Father would be less traumatic;

- It is in the best interest of B.C.C. and K.M.C. to help them foster a relationship with Father. B.C.C. has an interest in living with Father and both children desire a relationship with Father. The only alleged harm in doing so is Father's lack of consistency in the past. Now that Aunt has voluntarily relinquished possession, the children "need to understand that there is an adult who desires to have a relationship with them." Father testified that he communicates with the children and encourages them to make good decisions. Father argues that he wants the best for his children so that they have a better life than he did; and

- There is a strong presumption that the children's best interest is served by keeping them with the natural parent, citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

**B. *Holley* factors**

At the outset we note that because Father is not seeking to have the children reside with him, several of the *Holley* factors that evaluate proposed placement with

–20–

Father would not have been relevant to the trial court's decision. *See, e.g., Holley*, 544 S.W.2d at 371 (listing factors such as the stability of the home or proposed placement). But as we have explained, the *Holley* factors are not exhaustive, and a best-interest finding need not be supported by evidence of every factor. *Interest of C.B.*, No. 05-20-00699-CV, 2021 WL 164445, at *9 (Tex. App.—Dallas Jan. 15, 2021, no pet.) (mem. op.). Undisputed evidence of one factor may be sufficient, while the presence of scant evidence relevant to several factors will not support a finding. *Interest of C.V.L.*, 591 S.W.3d 734, 753 (Tex. App.—Dallas 2019, pet. denied). The same evidence can be relevant to both family code section 161.001(b)(1) termination grounds and the child's best interest. *Id.*

We consider the evidence in light of the relevant *Holley* factors.

***The children's desires.*** Neither child testified at trial, but there was some evidence offered relevant to this factor. The initial supervised visits that Father attended with the children went well. Father testified that the children like to talk with him and they reach out to him through text messages. He characterized other witnesses' testimony that the children did not want to talk with him as a lie.

Partlo, the children's advocate, testified:

Q. So taking all those things into consideration, do you believe that termination of [Father's] parental rights is the best thing for these two [children]?

A. Yes.

Q. Can you explain to the Court why?

A. It's primarily based on their reaction to wanting to interact with their father. As has been noted before, [K.M.C.] doesn't want to talk to him and refuses to talk to him. I think that comes from when [K.M.C.] was removed from the foster care and put temporarily in a healthcare facility and then got out and saw his father.

His father gave him a really hard time about having to be in that situation and since then [K.M.C.] does not want to talk to him. He didn't like the way he was treated. [B.C.C.] doesn't mind talking to him when he calls. But [K.M.C.] doesn't want to talk to him.

And when I've asked them what they wanted, you know, [K.M.C.] doesn't want to be with his father at all. [B.C.C.] would do it but he doesn't want to do it without [K.M.C.] so he doesn't want to do it because he doesn't want to leave [K.M.C.].

Based on this evidence, we conclude a fact finder could reasonably form a firm conviction that this factor weighed in favor of termination. *See In re A.B.*, 437 S.W.3d at 502–03 (discussing review of evidence under the clear and convincing standard of review).

***Emotional and physical needs of the child now and in the future, and emotional and physical danger to the children now and in the future.*** There is no evidence of physical danger to the children from a continued relationship with Father. But there was evidence of the children's emotional needs and problems. Cooper explained that both children are on medication, B.C.C. for "mood stabilizing" and K.M.C. for depression and anxiety. She explained that they are both behind in school and have failed some classes. There was also evidence that while the children were in Aunt's care, there were reports to the Department about physical abuse and "the family worked services."

–22–

Cooper testified that that B.C.C. had been moved six times during the past year and K.M.C. four. Five of B.C.C.'s moves were due to "behavioral issues," but the most recent move was so that he and K.M.C. could be placed together. Cooper explained that the children were removed from one foster home "due to aggressive behavior toward the foster dad in the home, threats were made and the foster parents decided due to the severity of the threats that they no longer felt safe with the [children] in the home." There have been "two incidents" toward other teen children in the children's current placement.

Cooper testified that the children have undergone some therapy but the moves have made it difficult: "whenever the [children] were seeing a therapist, the therapy did appear to be effective up until there was an outburst or behavior issues resulting in a discharge notice." In their current placement, however, the Department is working with the foster father "to get the [children] reassigned to a local psychiatrist in the area along with a trauma focused therapy," although Cooper could not give a date when this was to be accomplished.

Partlo testified about the children's "educational needs and emotional needs," discussing B.C.C.'s possible dyslexia and how both children appeared to be far below grade level in math. Aunt home-schooled the children, and as a result, according to Partlo, "they really hadn't had any life experiences with hardly anyone. So dealing with lots of kids, and both in a CPS home or foster home, and then going to school was a, you know, very, very abrupt situation for them to deal with."

Partlo agreed that the children needed therapy. He testified that he did not "see that there could be any positive influence" from Father in the children's efforts to "focus on the things that they need to focus on to move forward." He testified that he has seen a difference in the children since they came under the Department's care: "I've [seen] them grow and expand in their ability to deal with society because they were so sheltered living at home and being home schooled."

Cooper explained that she did not see any benefit to the children in trying to continue to work with Father due to the "lack of consistency" in his relationship with the children. She testified, "it appears to do more harm to the [children] than helping when there's a lack of communication and consistency with building a relationship and a bond with [Father]." Cooper testified that the children "have both stressed to me the frustration of calling and not being able to speak with [Father] due to the amount of changed phone numbers," and she believes the inability to maintain regular contact with Father is detrimental to the children.

Simmons, the guardian ad litem who had been involved in the case for a year, argued that the children "need intensive trauma therapy." He argued,

> And I just think that—I understand [Father's] position but I just think that it would be in the best interest of the children for them to just have some normalcy and not inconsistency so that they can focus on what they need to focus on within the remaining three to four years in school. And I just don't think that that [Father] understands what the children have been exposed to and his lack of willingness to complete the programs—I mean, the services to help himself so that he may be able to help the children.

Simmons also emphasized that in the months before trial, Father's admitted focus was on his other child rather than on completing his services to help K.M.C. and B.C.C.

Based on this evidence, we conclude a fact finder could reasonably form a firm conviction that this factor weighed in favor of termination.

***The plans for the children by the agency seeking custody and the programs available to promote the best interest of the children.*** Although the Department's goal for the children is permanent adoption, Cooper acknowledged that the Department did not have an adoptive placement for the children at the time of trial. She testified that the children's current placement was not interested in adoption. She testified that she believed termination would facilitate permanent placement because more foster homes would consider adoption for children not "at risk because their parental rights are still intact."

Cooper testified that the Department has programs to address the children's emotional and educational needs. She also explained that "[t]he [D]epartment plans to find the children an adoption motivated home and in the event that the [children] are not able to be adopted, the [D]epartment has programs to assist the children with transitioning into adulthood."

We conclude this factor is neutral. All parties agreed that adoption is unlikely, and there is no evidence that the programs for transition into adulthood would not be available to the children if Father retained his parental rights.

***The parental abilities of the individuals seeking custody and the stability of the home or proposed placement.*** All parties admitted that the probability of adoption was low for two teenaged boys. And at the time of trial, as Father argues, numerous attempted placements had already failed. But also at that time, the children were placed together as they both preferred. Partlo testified that the children enjoyed each other's company and looked forward to seeing each other when they were living apart: "when they were separated the happiest . . . times [were] when I would drive [K.M.C.] from Red Oak down to Corsicana and they would get to spend four or five hours together and . . . [B.C.C.] was constantly calling and asking when is the next time I was going to bring [K.M.C.] down; that was exciting to them." He continued, "now that they're together, you got the brotherly situation of constantly living with somebody. So they do truly want to be together and they're like regular brothers. They're going to have instances but they support one another very much."

Partlo testified that the children's placement together in the current foster home was "the best plan for them." He explained, "The home they're in is a good home. The father is a good person." K.M.C.'s adjustment there was eased by a housemate who had been in a prior placement with him. The foster parent was working on obtaining therapy for the children. Partlo is a "strong advocate" for the children "getting into therapy" and is "going to investigate whether they're getting the right educational counseling" by discussing their needs with the counselors at school.

Father has completed twelfth grade and has been a hair and barber instructor. He testified that he receives $800.00 a month in social security benefits because of depression and arthritis in his knees. Father apparently is not seeking to have the children live with him in his home, but suggested two possible placements for the children. Cooper testified that the first person was not willing to be considered as a placement. Father provided the name of a second person the day before trial, but Cooper testified that a background check revealed "criminal history" making this person ineligible as a possible placement. Father disputed the type of offense involved and testified that the person actually took responsibility for someone else's theft. But he did not offer other evidence regarding this person's ability or qualifications to serve as a placement for the children.

Based on this evidence, we conclude a fact finder could reasonably form a firm conviction that this factor weighed in favor of termination.

***The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one.*** Father admitted that he tested positive for cocaine in July 2019 when he first came in contact with the Department, and tested positive for cocaine again in April 2020. The test results were admitted into evidence at trial. Although some of Father's UA testing was negative, tests of his hair continued to be positive, and Cooper testified that this was her "biggest concern" about Father's successful parenting of the children. Father admitted the tests were positive but testified that it has been "a long time" since he used cocaine. He did not

–27–

offer any acknowledgement that his cocaine use could affect his ability to parent his children or declare any intent to cease using cocaine. There was also evidence that he did not respond to Trejo's attempt to set up further drug testing in 2020; he had apparently again changed phone numbers without informing her.

Father admitted he completed only the psychological evaluation although the Department set up services for him near his new home after he moved. He admitted that he started counseling but the counselor discharged him because he missed sessions. He initially explained his failure to complete services in 2019 by relying on illness that he conceded did not begin until mid-2020. But he later testified that in the months before he became ill, he did not complete services because "I got another child. I had another family." He explained that he did not attempt to complete services "[b]ecause the sake of my new fresh daughter" he "almost lost," apparently from complications at birth. He explained, "[s]o I'm just—I love [K.M.C. and B.C.C.] but I got a little bitty daughter that ain't been here, never been here before."

Father also did not identify any efforts he made to find or contact his children in the seven- or eight-year period they resided with Aunt. He testified only that he was unable to do so because of his limited income. And after the children came into the Department's care, Father has missed scheduled visits and telephone calls. Partlo testified that he had not observed any visits between Father and the children: "I went to go observe a visit that was scheduled and [Father] never showed up for that visit.

That was one of the times where [B.C.C.] was living in Corsicana and CPS drove him all the way up to Dallas and brought [K.M.C.] from Red Oak and they—the father never showed up."

Based on this evidence, we conclude a fact finder could reasonably form a firm conviction that this factor weighed in favor of termination.

***Any excuse for the acts or omissions of the parent.*** Father testified that he has been ill with pneumonia and possibly COVID since June of 2020. He also suffers from depression and cannot work because of it. He also testified that the children lived with him after their mother died in 2011 or 2012. They were enrolled in school. Aunt then took the children "for the summer," but he never saw them again until the Department contacted him in 2019. He testified that he did not know where to find the children and did not have the resources to obtain help in finding them. He also testified that he had been caring for another of his children, a baby daughter, when she was ill, causing him to miss visits and appointments for services.

Based on this evidence, we conclude this factor weighs against termination.

***Conclusion.*** Our review of the record in light of the *Holley* factors reveals clear and convincing evidence to support the trial court's ruling. At least one of the children does not desire to have a relationship with Father. Both of the children have significant emotional needs that Father neither acknowledged nor had plans to address, and there was evidence that continuing Father's parental relationship would be emotionally detrimental to the children. Father has not provided or offered a

stable placement for the children, the Department has had difficulty in doing so, and all parties conceded that adoption is unlikely. At the time of trial, however, the Department offered evidence that the most recent placement had some possibility of success, and the Department could support it with needed services and counseling. There was clear and convincing evidence of Father's failure reliably to communicate with the children or to take the actions necessary to gain the parenting skills he needs to support the significant challenges facing his children. Consequently, we conclude there is legally and factually sufficient evidence to support the trial court's best interest findings, and we decide Father's fourth issue against him. *See In re M.C.*, 352 S.W.3d at 568 (applying legal and factual sufficiency standards and concluding evidence was sufficient to support termination).

**5. Sufficiency of the evidence to support appointment of the Department as managing conservator**

In his fifth issue, Father challenges the sufficiency of the evidence to support appointment of the Department as the children's managing conservator. He relies on the presumption in family code section 153.131(a) that parents shall be appointed managing conservators of their children. TEX. FAM. CODE § 153.131(a) (parent shall be appointed managing conservator absent a finding that appointment is not in the child's best interest). As Father argues, in cases where a trial court's termination of the parent-child relationship is reversed, a parent is required to make an independent challenge to the trial court's finding under family code section 153.131(a) to obtain reversal of the conservatorship appointment, and Father does so here. *See In re*

*J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *12 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.).

Father argues the Department "has already demonstrated that they will significantly impair the children's physical health and emotional development" by leaving the children in Aunt's care after closing a previous case without additional intervention. He contends the Department now argues the opposite, that Aunt's home is not appropriate for the children. He concludes this evidence "shows that CPS is not appropriate to be the managing conservator of these children."

Given the trial court's judgment terminating his parental rights and our disposition of Father's other issues, however, Father cannot now challenge the Department's appointment as conservator. As the court in *In re J.R.W.* explained, "when a trial court terminates the parent-child relationship, the court also 'divests the parent and the child of all legal rights and duties with respect to each other.'" *In re J.R.W.*, 2013 WL 507325, at *12 (quoting TEX. FAM. CODE § 161.206(b)); *see also* TEX. FAM. CODE § 161.207 (if court terminates parent-child relationship to the only living parent, the court shall appoint "a suitable, competent adult, the [Department], or a licensed child-placing agency" as managing conservator); *Interest of C.V.L.*, 591 S.W.3d at 759 ("If the trial court orders termination, section 161.207 provides a mechanism to designate the Department as managing conservator of the child."). Accordingly, Father's challenge to the trial court's appointment of the Department as the children's permanent managing conservator

–31–

is without merit. *See In re J.R.W.*, 2013 WL 507325, at \*12. We decide Father's fifth issue against him.

## CONCLUSION

We affirm the trial court's judgment.

/Leslie Osborne//

LESLIE OSBORNE

JUSTICE

210091f.p05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF B.C.C. AND K.M.C., CHILDREN,

No. 05-21-00091-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas Trial Court Cause No. DF-08-09495-Z.
Opinion delivered by Justice Osborne. Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of June, 2021.